352-08/PJG/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

EASTWOOD ENTERPRISES S.A.,

                          Plaintiff,

   -against-

AFRICA SEA SHIPPING N.V. a/k/a
AFRICA SEA SHIPPING N.V., CURACAO

                      Defendant.
-------------------------------------------------------------x

**08 CV 6175**

**VERIFIED COMPLAINT**

Plaintiff, Eastwood Enterprises S.A. ("EASTWOOD"), as and for its Verified Complaint against Defendant Africa Sea Shipping N.V. a/k/a Africa Sea Shipping N.V., Curacao ("AFRICA SEA"), alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party.  This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.     At all times material hereto, Plaintiff EASTWOOD was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address in Monrovia, Liberia.

NYDOCS1/308043.1

3.     At all times relevant hereto, Defendant AFRICA SEA was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address in Curacao.

4.     On or about April 4, 2006, Plaintiff EASTWOOD, in the capacity as owner of the M/V USSUR, entered into a maritime contract of charter party with Defendant AFRICA SEA, as charterer, for the charter of the M/V USSUR for a period of 12 months (hereinafter "the Charter"). (A copy of the subject Charter is annexed hereto as **Exhibit A**.)

5.     By Addendum dated March 27, 2007, the Charter was extended for an additional year up through and including April 7, 2008 (+/- 30 days in Charterer's option). (A copy of Addendum No. 1 extending the Charter is annexed hereto as **Exhibit B**.)

6.     Pursuant to the terms of the Charter, the vessel was duly delivered into the service of the Defendant AFRICA SEA and performed the first year of service.

7.     Performance continued into the second year under Addendum No. 1 without interruption.

8.     Among the terms set forth in the Charter was a specifically negotiated redelivery clause (Ex. A Clause 46) which specified that the Defendant AFRICA SEA would ensure that the three cargoes carried immediately prior to redelivery of the vessel would be "clean" petroleum products.

9.     The significance of this clause was that it enhanced the value of the vessel either for purposes of sale or trade (chartering) at the anticipated conclusion of the Charter in that it would enable the vessel to carry "clean" products on the next voyage post-Charter.

10.     Under the terms of the Charter, as amended, the anticipated redelivery period was April 7, 2008, plus/minus 30 days in Defendant AFRICA SEA's option.

11. On or about December 3, 2007, while the vessel was performing under the Charter as amended, it suffered a breakdown unrelated to any failure or neglect of the Plaintiff EASTWOOD, which necessitated that it be taken out of service and repaired.

12. The vessel completed repairs in January 2008, and subsequently, on January 20, 2008, passed a Class Condition Survey certifying her suitability to resume trade, and was then duly tendered back to the Defendant AFRICA SEA for completion of the Charter.

13. In breach of its obligations, Defendant AFRICA SEA refused to accept the vessel back into service, declined to issue voyage or loading instructions and otherwise wrongfully left the vessel idle, despite the fact that the vessel was fully capable of performing as contemplated under the Charter.

14. Ultimately, and after allowing the vessel to remain idle for a period of approximately three (3) weeks, the Defendant AFRICA SEA repudiated the Charter by affirmatively indicating that it would not be providing any voyage instructions, or loading any further cargoes during the balance of the Charter period, all of which constituted a premature termination of the Charter and a concomitant breach of the obligation to redeliver the vessel with the last three cargoes being clean petroleum products as specified in Clause 46 of the Charter.

15. Prior to the breach as aforesaid, and in reliance on the Defendant AFRICA SEA's obligations to redeliver the vessel in the spring of 2008 as specified under the Charter, and in a "clean" condition by virtue of the prior three cargoes being "clean" petroleum products, Plaintiff EASTWOOD entered into a contract of sale for the vessel dated January 15, 2008 which provided for delivery of the vessel in a "clean" condition consistent with Defendant AFRICA SEA's obligations under the subject Charter to have loaded only clean products on the last three voyages prior to redelivery.

16.     By virtue of the Defendant AFRICA SEA's breach as aforesaid in its premature redelivery of the vessel and its failure to tender the vessel in "clean" condition, Plaintiff EASTWOOD was unable to perform under the sale agreement, the original sale agreement was cancelled and Plaintiff EASTWOOD suffered a loss in the sum of $620,000 due to the diminution in sale price paid by a subsequent buyer.

17.     In addition, the original buyer of the vessel, in contemplation of performance under the original sale contract and delivery of a "clean" ship at closing, had itself entered into a charter for the vessel dated January 18, 2008 to occur after the sale transaction.

18.     As a consequence of the cancellation of the original sale contract, the original buyer claims that it suffered a loss in respect to cancellation of that January 18, 2008 charter and has sued the Plaintiff EASTWOOD in the First Instance Court of Piraeus for damages in the sum $416,000, representing the original buyer's losses as a consequence of the cancellation of that charter.

19.     Finally, Plaintiff EASTWOOD has suffered an additional loss of $24,400 in the way of the need to give the subsequent buyers a four-day credit for hire lost during the period that the Defendant AFRICA SEA had improperly caused the arrest of the vessel in Nigeria which prevented the Plaintiff EASTWOOD from meeting the laycan for delivery under the subsequent sale contract.  The Plaintiff EASTWOOD has provided the Defendant AFRICA SEA with full security for the claims which it has alleged arising out of the subject charter and which were the focus of the Nigerian restraint.

20.     The damages as aforesaid were quantified in a hire statement submitted by Plaintiff EASTWOOD on or about June 18, 2008 to Defendant AFRICA SEA for the amounts due and outstanding under the charter in the net amount of $823,430.93 which sum incorporates

the above three referenced claims, as well as an offset for all sums due back to the Defendant AFRICA SEA for bunkers on redelivery and a refund of hire. A copy of that statement reflecting the net balance due the Plaintiff EASTWOOD in respect to Defendant AFRICA SEA's premature redelivery of the vessel is attached as **Exhibit C**.

21.    Despite due demand, AFRICA SEA has refused and/or otherwise failed the pay $823,430.93 which remains due and outstanding.

22.    The charter party provides for the application of English law and all disputes between the parties in excess of $50,000 are to be resolved in the English High Courts, and EASTWOOD specifically reserves its right to proceed in that forum, where EASTWOOD is soon to commence proceedings.

23.    This action is brought to obtain jurisdiction over AFRICA SEA and to obtain security in favor of Plaintiff EASTWOOD with respect to its claims against AFRICA SEA and in aid of the English High Court proceedings.

24.    This action is further brought to obtain security for any additional sums to cover Plaintiff EASTWOOD's anticipated attorneys' fees and costs in the English High Court proceedings and interest, all of which are recoverable as part of Plaintiff EASTWOOD's claim under English law.

25.    Under English law, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

26.    Plaintiff EASTWOOD estimates, as nearly as can be computed, that the legal expenses and arbitral costs of prosecuting the claim will be $175,000.00 and interest on its damages are estimated to be $164,686.17 (calculated at the rate of 8% for a period of 2.5 years, the estimated time for completion of the proceedings in the English High Court).

**Request for Rule B Relief**

27.    Upon information and belief, and after investigation, Defendant AFRICA SEA cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff EASTWOOD is informed that Defendant AFRICA SEA has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant AFRICA SEA (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

28.    The total amount to be attached pursuant to the calculations set forth above is **$1,163,117.10**.

WHEREFORE, Plaintiff EASTWOOD prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$1,163,117.10** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such

ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendant in the English High Court proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
      July 7, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____

Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)
80 Pine Street
New York, NY 10005
(212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York  )

       PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

       1.     I am a partner in the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

       2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

       3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                    Peter J. Gutowski

Sworn to before me this
7H day of July 2008.

   Notary Public

MANUEL A. MOLINA
Notary Public, State of New York
No. 02M06064999
Qualified In Kings County
Commission Expires Oct. 9, 2009

# Ex. A

**Code word for this Charter Party**
" SHELLTIME 4"

*Issued December 1984*

# Time Charter Party
### Geneva, 04ᵗʰ April 2006

| | |
|---|---|
| IT IS THIS DAY AGREED between  Eastwood Enterprises S.A | 1 |
| of          Monrovia Liberia    (hereinafter referred to as "Owners"), being owners of the | 2 |
| good  vessel called                       USSUR                        3 | |
| (hereinafter referred to as "the vessel") described as per Clause 1 hereof | 4 |
| and           Africa Sea Shipping N.V, Curacao                    (hereinafter referred to as "Charterers"):     5 | |

**Description Condition of Vessel**

1.  At the date of delivery of the vessel under this charter and throughout  the entire  duration of the charter    6
 (a) she shall be classed:  Russian Maritime Register of Shipping    7
 (b) she shall be in every way fit to carry ~~crude petroleum and/or~~ its products, cargoes to be    8
  always compatible with vessel's tanks, lines, pumps and heating coils

 (c)  she shall be tight, staunch, strong, in good order and condition, and in every way fit for the    9
  service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator    10
  and radar) in good and efficient state;    11
 (d) her tanks, valves and pipelines shall be oil-tight;    12
 (e)  she shall be in every way fitted for burning    13
  at sea –fuel oil with a maximum viscosity of  180 Centistokes at 50 degrees Centigrade/~~any    14
  commercial grade of fueloil~~ ("ACGFO") for main propulsion ~~diesel oil~~    15
   marine  gasoil ~~/ACGFO~~        for auxiliaries.    16

  in port -  ~~diesel oil~~  marine gasoil/~~ACGFO~~ for auxiliaries;    17

 (f)  she shall comply with the regulations in force so as to enable her to pass through the Suez and    18
  Panama Canals by day and night without delay;    19
 (g)  she shall have on board all certificates, documents and equipment required from time to time by    20
  ~~any~~  international  applicable law to enable her to perform the charter service without delay;    21
 (h) she shall comply with the description in ~~Form B~~  Q88 V2 and ABS appendix appended hereto, provided ho    22
  however   that if there is any conflict between the provisions of ~~Form B~~ Q88 V2 and ABS appendix  and any    23
  other provision  including this Clause 1,  of this charter such other provision shall govern.    24

**Shipboard Personnel and their Duties**

2.  (a) At the date of delivery of the vessel under this charter    25
 (i) she shall have a full and efficient complement of master, officers and crew for a vessel of her    26
  onnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
  trained to operate the vessel and her equipment competently and safely;    28
 (ii) all shipboard personnel shall hold valid certificates of competence in accordance with the    29
  requirements of the law of the flag state;    30
 (iii)  all shipboard personnel shall be trained in accordance with the relevant provisions of the    31
  International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, 1978;    32
 (iv)  there shall be on board sufficient personnel with a good working knowledge of the English    33
  language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    34
  to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be    35
  carried out quickly and efficiently.    36

 (b) Owners guarantee that throughout the charter service the master shall with the vessel's officers    37
  and crew, unless otherwise ordered by Charterers,    38
 (i)  prosecute all voyages with the utmost despatch;    39
 (ii) render all customary assistance; and    40
 (iii)  load and discharge cargo as rapidly as possible when required by Charterers or their agents    41
  to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the    42
  case may be) and in each case in accordance with any applicable laws of the flag state.    43
  Always weather permitting

**Duty to Maintain**

3.  (i)  Throughout the charter services Owners shall, whenever the passage of time, wear and tear or any    44
  event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the    45
  conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.    46
 (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the    47
  requirements of Clauses 1,2(a), or 10 then hire shall be reduced to the extent necessary to indemnify Charterers    48
  for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services    49
  under this charter, hire shall be reduced by an amount equal to the value,    50
  calculated at the rate of hire, of the time so lost.    51
  Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy    52
  available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded    53
  from any calculation under Clause 24.    54
 (iii)  If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in    55

|  | | writing and if, after the expiry of 10 days following the receipt by Owners of any such notice, | 56 |
|  | | Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence | 57 |
|  | | as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, | 58 |
|  | | until Owners have so demonstrated that they are exercising such due diligence . | 59 |

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the          60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of     61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without    62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including ~~without~~   63
~~limitation~~ Charterers' rights under Clause 21 hereof).                                              64

**Period Trading Limits**

4.  Owners agree to let and Charterers agree to hire the vessel for a period of                         65
    commencing  from the time and date of delivery of the vessel, for the purpose of carrying ~~all lawful merchandise~~  66
    as per main terms (subject always to Clause 28) ~~including in particular~~ ( refer to clause 49 )     67
    clean unleaded and/ or dirty petroleum products always to be compatible with the vessel's pumps, lines,
    valve and vessel's cargo resistance list
    ~~in any part of the world~~  within trading areas as agreed  as Charterers shall direct, subject to the limits of    68
    the current British Institute Warranties
    and any subsequent amendments thereof. ~~Notwithstanding the foregoing, but subject to Clause 25, Charterers~~   69
    ~~may order the vessel to ice bound waters or to any part of the world outside such limits provided the Owners~~   70
    ~~consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance~~   71
    ~~premium required by the vessel's underwriters as a consequence of such order.~~                    72
    Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places    73
    (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine   74
    lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always   75
    afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant   76
    the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for   77
    loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be   78
    loaded and discharged at any places as Charterers may direct, subject to Master's final approval which not to be   79
    unreasonably withheld provided that Charterers shall exercise due diligence to ensure that any ship-to-ship   80
    transfer operations shall conform to standards not less than those set  out in the latest published edition of the   81
    ICS/OCIMF  Ship-to-Ship Transfer Guide and ISGOTT requirements. The vessel shall be delivered by Owners   82
    at a port as per main terms at Owners' option and redelivered to Owners at a port  as per main terms   83
    at Charterers' option.                                                                          84

**Laydays/ Cancelling**

5.  The vessel shall not be delivered before             5th April             and Charterers shall     85
    have the option of  cancelling this charter if  the vessel is not ready and at their disposal on or before   86
    ( see clause 47 )

**Owners to Provide**

6.  Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees   87
    and all other expenses of the master, officers and crew also, except as provided in Clauses 4 and 34 hereof, for all   88
    insurance on the vessel, for all deck, cabin and engine-room stores, and for water , domestic garbage   89
    for all drydocking, overhaul,
    maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners'   90
    obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the   91
    performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to   92
    the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall   93
    refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of   94
    any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited   95
    to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.   96

**Charterers to Provide**

7.  Charterers shall provide and pay  whilst on hire  for all fuel (~~except fuel used for domestic services~~), towage and   97
    pilotage and shall pay  agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal   98
    dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all   99
    charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for   100
    Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or   101
    distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in   102
    connection with a general average sacrifice or expenditure shall be paid for by Owners.   103

**Rate of Hire**

8.  Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of   104
    (see clause 48 )            per day, and pro rata for any part of a day, from the time and date of her delivery (local   105
    time) until the time and date of her redelivery (local time) to Owners.   106

**Payment of Hire**

9.  Subject to Clause 3 (iii), payment of hire shall be made in immediately available funds to   107
    Owner's designated bank account   108
    ~~Account     in  per calendar month~~  every 30 days in advance, less:   109
    (i)      any hire paid which Charterers reasonably estimate to relate to off-hire periods, and   110
    (ii)     any amounts disbursed on Owners' behalf, any advances and commission thereon, and   111
             charges which are for Owners' account pursuant to any provision hereof, and   112
    (iii)    any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or   113
             24 hereof or otherwise in pursuant hereof   114

    any such adjustments to be made at the due date for the next  payment after the facts have been   115
    ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'   116
    account provided that Charterers have made proper and timely payment.   117
    In default of such proper and timely payment,   118
    (a) Owners shall notify Charterers of such default and Charterers shall within  seven days of receipt of   119
    such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from   120
    the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise ,   121
    and(b) Interest on any amount due but not paid on the due date shall accrue from   122
    the day after that date up to and including the day when payment is made, at a rate per annum   123

which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York     124
at 12.00 New York  Libor as published at 12:00  hrs in London time on the due date, or, if no such     125
  interest rate is published on that day, the interest rate published on the next preceding day     126
  on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months,     127
  compounded semi-annually.     128

| | | |
|---|---|---|
| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed     200     tones at any time during the charter period. | 129<br>130<br>131<br><br>132 |

Overtime ~~11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering of tank cleaning. (see clause 48 )~~  133 134

| | | |
|---|---|---|
| Instructions and Logs | 12.  Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. | 136<br>137<br><br>139<br>140<br>141 |

Bills of Lading

13. (a) The master (although appointed by Owners) shall be under the lawful orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise
(i)  from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b) from the master otherwise complying with Charterers' or their agents' orders;
(ii)  from any irregularities in papers supplied by Charterers or their agents.
(b)  Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo
(i)  at any place other than that shown on the bill of lading and/or
(ii)  without presentation of an original bill of lading
unless they have received from Charterers both written confirmation of such orders and an     indemnity ~~in a form acceptable to Owners (see clause 58 ) as per Owner's P & I Club wording with no bank guarantee~~

142
143
144
145

146
147
148
149

150
151
152
153
154
155

| | | |
|---|---|---|
| Conduct of Vessel's Personnel | 14.  If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 156<br>157<br>158<br>159 |

Bunkers at Delivery Redelivery

15. ~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid of the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~
( see clause 52 )

160
161
162
163
164
165
166

167

Stevedores, Pilots, Tugs

16.  Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that
(i)  the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and
(ii)  Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

168
169

170

171
172
173
174
175

176
177
178
179

| | | |
|---|---|---|
| Supernumeraries | 17.  Charterers may send  supernumeraries in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of    US$ 20    per day for each representative while on board the vessel.<br>Charterers supercargos joining the vessel to sign relevant Letter of Indemnity | 180<br>181<br>182 |

| | | |
|---|---|---|
| Sub-letting | 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfillment of this charter. | 183<br>184 |

Final Voyage

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for
(i)  disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and
(ii)  estimated bunkers on board at redelivery ~~pursuant to Clause 15~~ which may exceed the minimum requirements set forth in clause 15.Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made     good by Charterers.
If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the

185
186
187
188

189
190
191
192
193
194
195

vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or   196
to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.   197

Loss of Vessel

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; 198
Should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on 199
which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this 200
charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in 201
advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of 202
the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last 203
bunkering port. 204

Off-hire

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the 205
vessel's service or, from reduction in the vessel's performance, or in any other manner) 206
(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting 207
to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the 208
vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, 209
stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the 210
vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's 211
service) or cumulates to more than three hours (if resulting from partial loss of service); or 212
(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the 213
master, officers or crew; or 214
(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured 215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the 216
body of any person (other than a Charterers' representative), and such loss continues for more than three 217
consecutive hours; or 218
(iv) due to any delay in quarantine arising from the master, officers or crew having had 219
communication with the shore at any infected area without the written consent or instructions of Charterers or 220
their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local 221
law on the part of the master, officers, or crew; or 222
(v) due to detention of the vessel by authorities at home or abroad attributable to legal action 223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or 224
neglect of Charterers ); and/or due to any seizure under legal process then 225
without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers 226
hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again 227
ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at 228
which such loss of time commenced; provided, however, that any service given or distance made good by the 229
vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire. 230
(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure 231
arises wholly or partly from any of the causes set out in Clause 21 (a) above, then the period for which the vessel 232
shall be off-hire under this Clause 21 shall be the difference between 233
(i) the time the vessel would have required to perform the relevant service at such guaranteed speed , 234
and 235
(ii) the time actually taken to perform such service (including any loss of time arising from 236
interruption in the performance of such service). 237
For the avoidance of doubt, all time included under (ii) above shall be excluded from any 238
computation under Clause 24. 239
(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which 240
expression includes without limitation putting back, or putting into any port other than that to which she is bound 241
under the instructions of Charterers) for any cause or purpose mentioned in Clause 21 (a), the vessel shall be 242
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state 243
to resume her service from a position not less favourable to Charterers than that at which the deviation 244
commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire 245
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or 246
purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the 247
instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners 248
Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and 249
payable during any time lost thereby. 250
(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such 251
hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof 252
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability 253
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 254
(e) Time during which the vessel is off-hire under this charter shall count as part of the charter     period. 255
No claims for consequencial damages shall apply under this charter party 256

Periodical Drydocking

~~22. (a) Owners have the right and obligation to drydock the vessel, at regular intervals of~~ 257
~~On each occasion Owners shall propose to Charterers a date on which they wish to~~
~~drydock the vessel, not less than————————before such date, and Charterers shall offer a port for~~ 259
~~such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as~~ 260
~~practicable.~~ 261
~~Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers~~ 262
~~place the vessel at Owners' disposal clear of cargo other than tank-washings and residues. Owners shall be~~ 263
~~responsible and pay for the disposal into reception facilities of such tank washings and residues and shall have~~ 264
~~the right to retain any monies received thereof, without prejudice to any claim for loss of cargo under any bill of~~ 265
~~lading or this charter.~~ 266
~~(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have~~ 267
~~suitable accommodation for the purpose and reception facilities for tank-washings and residues), the vessel shall~~ 268
~~be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to~~ 269
~~resume Charterers' service and is at the position no less favourable to~~ 270
~~Charterers, whichever she first attains. However,~~ 271

258

~~(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to~~ 272
~~the standard required for entry into drydock for cleaning and painting the hull shall not count as off hire, whether~~ 273
~~lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and~~ 274

~~(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or~~ | 275
~~entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.~~ | 276
~~Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any~~ | 277
~~calculation under Clause 24.~~ | 278

~~The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for~~ | 279
~~Owners' account.~~ | 280
~~(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical~~ | 281
~~drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to~~ | 282
~~proceed to the special port until she next presents for loading in accordance with Charterers' instructions;~~ | 283
~~provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at~~ | 284
~~the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but~~ | 285
~~Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage~~ | 286
~~calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any~~ | 287
~~benefit they may gain in purchasing bunkers at the special port.~~ | 288
~~(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~ | 289
~~tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which~~ | 290
~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.~~ | 291

Owners warrant no dry docking during the charter period. In the event of emergency dry docking,
payment of hire shall cease from the time of deviation until the vessel is again in the same position.
All pilotage fuel and other expenses related to and while proceeding to and from and while dry docking
shall be for Owner's account

**Ship Inspection**  23. Charterers shall have the right at any time during the charter period to make such inspection at Charterers risk and | 292

expense of the vessel as they may consider necessary. This right may be exercised as often and at such intervals | 293
as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage, Owners | 294
affording all necessary co-operation and accommodation on board provided, however, | 295
(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise | 296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or | 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase | 298
Charterers' responsibilities to Owners or third parties for the same; and | 299
(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their | 300
servants or agents in the exercise or non-exercise of the aforesaid right. | 301

**Detailed**
**Description**
**and Performance**  24.(a) Owners guarantee that the speed and consumption of the vessel shall be as follows:-     ( see also vessel's description) | 302

| | Maximum average bunker consumption | | |
|---|---|---|---|
| Average speed | main propulsion | auxiliaries | 303 |
| in knots | fuel oil/diesel oil | fuel oil/diesel oil | 304 |
| | | | 305 |
| Laden | tonnes | tonnes | 306 |
| Ballast | | | 307 |

The foregoing bunker consumption are for all purposes except cargo heating and tank cleaning | 308
and shall be pro-rated between the speeds shown. | 309
The service speed of vessel is   knots laden and    knots in ballast and in the absence | 310
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one | 311
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to | 312
steam at any speed within the range set out in the table (the "ordered speed"). | 313
If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, | 314
and the average speed actually attained by the vessel during the currency of such order exceeds such ordered | 315
speed plus 0.5 knots (the 'maximum recognised speed"), then for the purpose of calculating any increase or | 316
decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed | 317
actually attained. | 318
For the purposes of this charter the "guaranteed speed" at any time shall be the then-current | 319
ordered speed or the service speed, as the case may be | 320
The average speeds and bunker consumptions shall for the purposes of this Clause 24 be | 321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each | 322
period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) | 323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction | 324
of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds | 325
exceed force 8 5 on the Beaufort Scale for more than 12 hours. | 326

(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary)  327
the vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such shortfall or excess  328
results  329
 (i)  from a reduction or an increase in the average speed of the vessel, compared to the speed  330
guaranteed in Clause 24 (a), then an amount equal at the hire rate of the time so lost or gained, as the  331
case may be, shall be deducted from or added to the hire paid;  332
 (ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers  333
which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent  334
to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average  335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid.  336
 The addition to or deduction from hire so calculated for laden and ballast mileage respectively  337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather  338
Periods, by dividing such addition or deduction by the number of miles over which the performance has been  339
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather  340
Periods, in order to establish the total addition to or deduction from hire to be made for such period.  341
 Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other  342
remedy available to Charterers.  343
 (c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each  344
successive anniversary of the date on which the vessel enters service, and for the period between the last such  345
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire  346
arising under this Clause during the final year or part year of the charter period shall in the first instance be settled  347
in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary  348
adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to  349
Owners as the case may require.  350
 Payments in respect of increase of hire arising under this Clause shall be made promptly after  351
receipt by Charterers of all the information necessary to calculate such increase.  352
 **No over performance clause to apply**

Salvage  25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to  353
or loss of hire except as herein provided) incurred in saving or attempting to save life or in  354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that  355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of  356
services rendered under this Clause 25.  357
 All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers  358
after deducting the master's, officers' and crew's share.  359

Lien  26.  Owners shall have a lien upon all cargoes and all freights,sub-hires  sub-freights and demurrage for any amounts  360
due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not  361
earned, and for all claims for damages arising from any breach by Owners of this charter.  362

Exceptions  27.  (a)  The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided,  363
be liable for any loss or damage or delay or failure arising  or resulting from any act, neglect or default of the  364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless  365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion,  366
bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however,  367
that Clauses 1,2,3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or  368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage  369
or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal  370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or  371
restraint of princes, rulers or people.  372
 (b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels  373
in distress and to deviate for the purpose of saving life or property.  374
 (c)  Clause 27 (a) shall not apply to or affect any liability of Owners or the vessel or any other relevant  375
person in respect of  376
 (i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane  377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter,  378
whether or not such works or equipment belong to Charterers, or  379
 (ii)  any claim (whether brought by Owners or any other person) arising out of any loss of or  380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague  381
Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill  382
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the  383
Hague-Visby Rules.  384
 (d)  In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not  385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.  386

Injurious  28.  No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the  387
Cargoes  foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such  388
damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that  389
would expose the vessel to capture or seizure by rulers or governments.  390

Grade of  29.  Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of  180        Centistokes at 50  391
Bunkers  degrees Centigrade/ACGFO for main propulsion and ~~IFGO /ACGFO~~ for the auxiliaries. If Owners require  392
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.  393
 Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality  394
~~complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading~~  395
~~company and with its specification for marine fuels as amended from time to time~~ (see clause 76 )  396

Disbursements  30.  Should the master require advances for ordinary disbursements at any port, Charterers or their agents  397
shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per  398

cent, and all such advances and commission shall be deducted from hire.                    399

| Laying-up | 31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the | 400 |
| | vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be | 401 |
| | adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should | 402 |
| | reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of | 403 |
| | times during the charter period. | 404 |

| Requisition | 32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this | 405 |
| | charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in | 406 |
| | respect of such requisition period shall be for Owners' account. ~~Any such requisition period shall count as part of~~ | 407 |
| | ~~the charter period.~~ | 408 |

| Outbreak of War | 33. If war or hostilities break out between any two or more of the following countries. U.S.A., Russia ~~U.S.S.R.~~ | 409 |
| | P.R.C., U.K., ~~Netherlands~~, both Owners and Charterers shall have the right to cancel this charter. | 410 |

| Additional War Expenses | 34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war | 411 |
| | Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which | 412 |
| | are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of | 413 |
| | such expenses as soon as practicable and in any event before such expenses are incurred, ~~and provided further~~ | 414 |
| | ~~that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any~~ | 415 |
| | ~~claims by Owners under their war risk insurance arising out of compliance with such orders.~~ | 416 |

| War Risks | 35. (a)  The master shall not be required or bound to sign bills of lading for any place which in his or | 417 |
| | Owners' reasonable opinion: is dangerous or impossible for the vessel to enter or reach owing to any blockade, | 418 |
| | war, hostilities, warlike operations, civil war, civil commotions or revolutions. | 419 |
| | (b)  If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in | 420 |
| | Clause 35 (a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach | 421 |
| | or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter | 422 |
| | (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and | 423 |
| | Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or | 424 |
| | discharged, as the case may be, at any other place within the trading limits of this charter (provided such other | 425 |
| | place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been | 426 |
| | received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at | 427 |
| | liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in | 428 |
| | their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due | 429 |
| | fulfillment of Owners' obligations under this charter so far as cargo so discharged is concerned. | 430 |
| | (c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, | 431 |
| | arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever | 432 |
| | given by the government of the state under whose flag the vessel sails or any other government or local authority | 433 |
| | or by any person or body acting or purporting to act as or with the authority of any such government or local | 434 |
| | authority including any de facto government or local authority or by any person or body acting or purporting to | 435 |
| | act as or with the authority of any such government or local authority or by any committee or person having under | 436 |
| | the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by | 437 |
| | reason of or in compliance with any such directions or recommendations anything is done or is not done, such | 438 |
| | shall not be deemed a deviation. | 439 |
| | If by reason of or in compliance with any such direction or recommendation the vessel does not | 440 |
| | proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed | 441 |
| | to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part | 442 |
| | of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this | 443 |
| | charter so far as cargo so discharged is concerned. | 444 |
| | Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of | 445 |
| | Shipping War Risks Clause 1952. | 446 |

| Both to Blame Collision Clause | 36. If the liability for any collision in which the vessel is involved while performing this charter falls to be | 447 |
| | determined in accordance with the laws of the United States of America, the following provision shall apply: | 448 |
| | "If the ship comes into collision with another ship as a result of the negligence of the other ship and any | 449 |
| | act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the | 450 |
| | management of the ship, the Owners of the cargo carried hereunder will indemnify the carrier against all loss, or | 451 |
| | liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or | 452 |
| | damage to, or any claim whatsoever of the Owners of the said cargo, paid or payable by the other or non-carrying | 453 |
| | ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other ship or non-carrying | 454 |
| | ship or her Owners as part of their claim against the carrying ship or carrier". | 455 |
| | "The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship | 456 |
| | or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or | 457 |
| | contact." | 458 |
| | Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the | 459 |
| | foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be | 460 |
| | determined in accordance with the laws of the United States of America. | 461 |

| New Jason Clause | 37. General average contributions shall be payable according to the York/Antwerp Rules, 1974 , as amended 1994 | 462 |
| | and shall be adjusted in London in accordance with English law and practice ~~but should adjustment be made~~ | 463 |
| | ~~in accordance with the law and practice of the United States of America, the following provision shall apply:~~ | 464 |
| | ~~"In the event of accident, danger, damage or disaster before or after the commencement of the~~ | 465 |
| | ~~voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the~~ | 466 |
| | ~~consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers,~~ | 467 |
| | ~~consignees or Owners of the cargo shall contribute with the carrier in general average to the payment of any~~ | 468 |
| | ~~sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and~~ | 469 |
| | ~~special charges incurred in respect of the cargo."~~ | 470 |
| | ~~"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said~~ | 471 |
| | ~~salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover~~ | 472 |

|  | | |
|---|---|---|
| | the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by | 473 |
| | the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." | 474 |
| | Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the | 475 |
| | foregoing terms, to be applicable where adjustment of general average is made in accordance with the English laws | 476 |
| | and practice of the United States of America. | 477 |

**Clause Paramount**

28. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the — 478
following clause: — 479
"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject — 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of — 481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed — 482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be — 483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his — 484
responsibilities or liabilities under the Hague-Visby Rules". — 485
"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, — 486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. — 487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities — 488
or an increase of any of his responsibilities or liabilities under the Hague Rules". — 489
"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if — 490
applicable, such term shall be void to that extent but no further". — 491
"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the — 492
right of any relevant party or person to limit his liability under any available legislation and/or law". — 493
( see clause 63 )

**TOVALOP**

39. Owners warrant that the vessel is: — 494
(i) a tanker in TOVALOP and — 495
(ii) properly entered in _____ P&I Club — 496

and will so remain during the currency of this charter. — 497
When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution — 498
Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the — 499
escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or — 500
not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to — 501
Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution — 502
Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners — 503
advised of the nature and result of any such measures taken by them and, if time permits, the nature of the — 504
measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be — 505
deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that: — 506
(1) any such escape or discharge or Threat was caused or contributed to by Charterers, or — 507
(2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International — 508
Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such — 509
escape or discharge or to the Threat, would have been exempt from liability for the same, or — 510
(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising — 511
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States — 512
Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States — 513
Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such — 514
excess under either the 1971 International Convention on the Establishment of an International Fund for — 515
Compensation for Oil Pollution Damage or under CRISTAL; — 516
PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures — 517
should be discontinued, Owners so notify Charterers and thereafter Charterers shall have no right to — 518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this — 519
Clause 39 shall thereupon cease. — 520
The above provisions are not in derogation of such other rights as Charterers or Owners may have — 521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP. — 522
The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability — 523
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the — 524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as — 525
amended from time to time. The terms "Oil", "Pollution Damage" and "Tonnage" shall for the purposes of this — 526
Clause 39 have the meanings ascribed to them in TOVALOP.    ( see clause 57 ) — 527

**Export Restrictions**

40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to — 528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was — 529
produced and/or shipped. — 530
Charterers shall procure that all bills of lading issued under this charter shall contain the following — 531
clause: — 532
"If any laws rules or regulations applied by the government of the country in which the cargo was — 533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo — 534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to — 535
require cargo Owners forthwith to nominate an alternative discharge place for the discharge of the — 536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the — 537
prohibition, and carriers shall be entitled to accept orders from cargo Owners to proceed to and — 538
discharge at such alternative place. If cargo Owners fail to nominate an alternative place within 72 — 539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be — 540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place — 541
on which they or the master may in their or his absolute discretion decide and which is not subject to the — 542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill — 543
of lading so far as the cargo so discharged is concerned". — 544
The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading — 545

being deemed to be references to this charter.                                                546

Law and
Litigation

41. (a) This charter shall be construed and the relations between the parties determined in accordance    547
with the laws of England    548

(b) Any dispute arising under this charter shall be decided by the English Courts to whose    549
jurisdiction the parties hereby agree.    550

~~(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain~~    551
~~the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect~~    552
~~to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the~~    553
~~provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being~~    554
~~in force.~~    555
~~(i) A party shall lose its right to make such an election only if:~~    556
~~(a) it receives from the other party a written notice of dispute which~~    557
~~(1) states expressly that a dispute has arisen out of this charter;~~    558
~~(2) specifies the nature of the dispute; and~~    559
~~(3) refers expressly to this clause 41 (c)~~    560
~~and~~    561
~~it fails to give notice of election to have the dispute referred to arbitration not later than~~    562
~~30 days from the date of receipt of such notice of dispute;~~    563
~~(ii) The parties hereby agree that either party may~~    564
~~(a) appeal to the High Court on any question of law arising out of an award;~~    565
~~(b) apply to the High Court for an order that the arbitrator state the reasons for his award;~~    566
~~(c) give notice to the arbitrator that a reasoned award is required; and~~    567
~~(d) apply to the High Court to determine any question of law arising in the course of the~~    568
~~reference.~~    569
~~(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in~~    570
~~which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that~~    571
~~party furnishes to the other party security to which that other party would have been entitled in such legal~~    572
~~proceedings in the absence of a stay.~~    573

Disputes up to 50,000. – Shall be settled according to small claims procedure as per LMAA Rules

Construction

42. The side headings have been included in this charter for convenience of reference and shall in no way    574
affect the construction hereof.    575

Additional clauses 43 – 80 as per rider to be incorporated in this charter party

THE OWNERS                                        THE CHARTERERS

Disclaimer:
This Charter Party is a computer generated copy of SHELLTIME 4 form, using software, which is the copyright of *Meridian Brokerage Inc.* It is a precise copy of the original document that can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author. The Author, Licensee and the End User assume no responsibility for any loss or damage caused as a result of discrepancies and/or typographical error(s) between the original SHELLTIME 4 form and this computer generated copy.

**Africa Sea Shipping N.V. Rider Clauses 43 to 80 :**

43) Owners warrant the following  from aa) to hh) : -

aa) vessel can bunker 1 / 2 vessels simultaneously, however same subject to Master's
    reasonable discretion and weather permitting.

bb) Up to 100 lubricant drums can be safely stored on the deck of the vessel at charterer's
    risk and expense.

cc) Master, officers and crew are experienced in high seas bunkering operations

dd) Master, officers and crew during the duration of the time charter will perform high seas
    bunkering operations any time day or night, Sundays and holidays included.

ee) Vessel is fitted with single side band radio and Inmarsat C capable of voice, e-mail
    and fax.

ff)  Vessel is not equipped with floating hoses which to be supplied and paid for by the Charterers

gg)  The vessel is not equipped with flow meters but will be provided by charterers

hh)  Vessel does not have on board any Yokohama fenders suitable for ship-to-ship transfer

44) Period

    Period 12 months 30  days more or less in Charterers
    option

45) Delivery

    Dropping outward pilot station Dakar

46) Redelivery

    Dropping outward pilot station Las Palmas/ Luanda range in Charterers option
    with last three cargoes clean petroleum products UNLDD/UNDRK 2.50 NPA''

47) Laycan

    05 – 15 April 2006

48) Daily Hire

    USD  5900 less 1.25 pct address commission

    Hire is payable 30 days in advance by telegraphic transfer to Owner's nominated bank
    account.

    USD 1,500 per month for overtime which is payable together with hire
    USD 500 per month for master's bonus which  to be paid to the Owners who shall
    forward bonus to the crew

    Communication expenses between vessel / charterers to be for charterer's account and
    payable against supporting documents presented by Owners.

49) Cargoes to be carried

   Clean unleaded and/or dirty petroleum products always to be compatible with vessel's pumps, lines, valves and vessel's cargo resistance list.

50) Trading limits

   Between good and safe ports/places , always afloat, U.K / Continent , Mediterranean Sea, Atlantic – Indian Ocean, Arabian Gulf, Red Sea, Caribbean Sea including Cuba but always excluding the USA and US controlled Caribbean islands but including high seas bunkering operations Owners exclusions Canada/North of Hamburg/Israel/TOC/ Albania/ Iraq. Main intention is to trade within Dakar – Luanda range.

51) Owners warrant that the vessel is equipped with stern line enabling the vessel to load and discharge from stern and is in all respects fitted  to perform bunkering in the high seas.

   Pumping warranties when discharging  by stern line are not applicable.

52) Charterers to take over and pay estimated bunkers on board on  delivery along the first hire payment and Owners on redelivery along the last hire payment. About same quantities delivery/ redelivery with minor differences to be adjusted accordingly.  Same prices on delivery and redelivery. Owners may have the right to buy bunkers on their behalf provided not affecting Charterers operation, Charterers to have first refusal for such supply  unless their price is not competitive.

53) ~~1.(a) To the best of  Owner's knowledge, at the date of this Charter there is a  SIRE report on the vessel which has been registered in the revised SIRE Register. ) To the best of  Owner's knowledge,~~
   ~~the Vessel has not been rejected or refused by any charterer since the inspection leading to the said SIRE report.~~

   ~~(b) A Vessel Particular Questionnaire ("VPQ") under the revised SIRE system has been lodged and is up to date at the date of this charter party.~~

   ~~2 During the currency of this Charter :-~~

   ~~(a) Owners will ( if so requested by the Charterer  cooperate in vaving the vessel inspected by OCIMF member or major oil company charterers if any current SIRE report has to be renewed.~~

   ~~(b) (i) If the vessel fails to obtain vetting approval as a result of any vetting inspection carried out under the revised SIRE system Owners will endeavour to have the vessel inspected again as soon as it is reasonably practicable.~~

   ~~(c) (ii) Should the Charterers otherwise require vetting inspections of the Vessel, and if these inspections are carried out during the currency of this charter, then any loss of time, deviation costs and inspection fees in connection with the inspection shall be for the Charterer's account.~~

   ~~(d) A failed vetting inspection under the revised SIRE system by an "Oil Major", or any other pertinent company shall not constitute a reason for the Charterer to put the Vessel off-hire, or enable the Charterer to assert a claim under this Charter ( this clause).~~

   ~~(e) The Pertinent Vessel Particular Questionnaire ("VPQ") will be maintained up to date by Owners throughout the duration of the Charter.~~

3 To the best of Owner's knowledge , the Vessel has not been rejected or refused
by any Charterer since the inspection leading to the said SIRE report.

This fixture is subject to the vessel's approval by Shell within 60 days of the commencement of the
charter, subject to the availability of an inspector. An inspection can only be performed at a load or
discharge port. The Owner will invite Shell to inspect the vessel at the first load port.

54) Owners to have the option to substitute the M/T Ussur with a sister vessel subject to
Charterer's acceptance which not to be unreasonably withheld during the currency of the
time charter. Such change of vessel to take place at a place mutually agreeable between Owners and
Charterers. Such change will not hinder Charterers in their execution of their bunkering program.

55) To the best of this Owners and previous Owners knowledge,  Owners warrant that the vessel
and her Owners or Managers are not on any black or boycott list hindering or preventing the
vessel's free trading within this Charter. Otherwise as per charter party.

56) Owners warrant that the vessel is a member of a first class P&I club
West of England and will remain so during the currency of this Charter Party.

57) Owners warrant that they  and the vessel is entered into the I.T.O.P.F ( International Tanker
Owners Pollution Fund ) and will remain so during the currency of this charter party period.

58) If Charters by telex, fascimile or other form of written communication that specifically
refers to this clause/ addendum requests the Owner to discharge a quantity of cargo either: -

a)    Without bills of lading and/or
b)    at a discharge place othe than that named at the bill of lading and/or
c)    that is different from the bill of lading quantity,

then the Owners shall discharge such cargo in accordance with the Charterer's instructions
in consideration of receiving the Letter of Indemnity
which shall be deemed to be given by the Charterers on each and every such  occasion.

(A) The Charterers shall indemnify the Owner, and the Owner's servants and agents in respect of
any liability, loss or damage of whatsoever nature ( including legal costs as between attorney
or solicitor and client and associated expenses) which the Owner may sustain by reason of
delivering such cargo in accordance  with the Charterers request.

(B) If any proceeding is commenced against the Owner of any of the Owner's servants or agents
in connection with the vessel having delivered cargo in accordance with such request, the
Charterer shall provide the Owner or any of the Owner's servants or agents from time to time
on demand with sufficient funds to defend the said proceedings.

(C ) If the vessel or any other vessel or property belonging to the Owners should be arrested or
detained, or if the arrest of detention thereof should be threatened, by reason of discharge in
accordance  with Charterer's instructions as aforesaid, the Charterers shall provide on demand
such bail or other security as may be required to prevent such arrest or detention or to secure
the release of such vessel or propertyand the Charterers shall indemnify the Owners in
respect of any loss, damage or expense caused by such arrest or detention whether or not the
same may be justified.

(D ) The Charterer shall, if call upon to do so at any time while such cargo is in the Charterer's
possession,  custody or control, redeliver the same to Owner.

(E) The Owner shall promptly notify the Charterers if any person ( other that a person to whom
the Charterer ordered the cargo to be delivered) claims to be entitled to such cargo and /or if
the vessel or any other  property belonging to the Owner is arrested by reason of any such
discharge of cargo.

(F)  This indemnity shall be governed and construed in accordance with English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England

When the Charter Party has been signed, the above clause is considered invoked by the Charterers and no further indemnities are to be given for each discharge.

**LOI as per standard wording of P and I clubs'**

59) The vessel is to comply with IMO rules insofar as trades agreed upon this Charter, throughout the charter period as product tanker. The owner at their expense throughout this Charter warrants to have the vessel in all respect eligible for trading within, to and from ranges and areas specified in the Charter party, and that at all necessary times she shall have on board all certificates, records and other documents required for such service. The Owner warrants that the vessel during the currency of this Charter Party will be in compliance with and have on board respective certificates as required and as amended by: -

Article VII of the International Convention of Civil Liability for Oil Pollution Damages of 1969 ( CLC Certificate )

Solas Safety Construction and Equipment Certificate.

60) The Owner warrants that the Master, Chief Officer and Chief Engineer can speak and writes English sufficiently well to ensure the safe and efficient operation of the vessel at all times.

61) The Charterer has the right to load up to 4 grades with double valve segregation within the vessel's natural segregation. The Charterer has the right to commingle cargo in the vessel's tanks subject to the vessel's safety at Master's reasonable discretion.

62) The Owner has the right to sell the vessel provided that the Owner gives the charterer written notice not less than 60 days in advance. The Charterer shall have 30 days to exercise the option either to continue this charter party with the new owners under the same terms and conditions as set forth herein, or to terminate this charter party at any time up to the end of the owner's 60 days notice period.

63) Paramount clause

The Charterer shall procure that all bills of lading issued under this Charter shall contain the following Paramount clause: -

The bill of lading :-

1)  Have effect subject to any national legislation making the Hague Rules as amended by the Protocol signed in Brussels on the 23rd of February 1968 ( The Hague Visby Rules ) compulsorily applicable to this bill of lading and nothing herein contained shall be deemed to be a surrender by the carrier of any of his rights or immunities under the said legislation. The Hague Visby Rules shall not apply to this contract where the goods carried hereunder consist of
cargo which by this contract is stated as being carried on deck and is so carried in the absence of such legislation.

2)  Having effect subject to any national legislation making the Hague Rules compulsorily applicable to this bill of lading and nothing herein contained shall be
deemed to be a surrender by the carrier of any of his rights or immunities under the said legislation or an increase of any of his responsibilities or liabilities under the said legislation

or

3)  In any other case have effect as if the contract of carriage to which the Hague Rules applies and the carrier shall be entitled to the benefit of the privileges, right and immunities conferred by the Hague Rules as if the same were herein specifically set out.

If any term of this bill of lading shall be repugnant to the Hague Visby Rules or to the Hague Rules, as the case may be, such term shall be void to the extent but no further.

64) Notices for delivery dates/place : 3/2/1 days and Charterers/Owners keep each other posted of vessel's position /prospects.

65) The Charterer to have the Owner's permission to supplement lines and mooring wires, load and/or discharge hoses/equipment if required, at no additional costs to Owners. The Owner to ensure that same is reasonably maintained. The Charterer has the option to remove at their expense such material/ equipment prior or upon delivery.

66) The Owner warrants that the vessel is capable of discharging her entire cargo within 24 hours or maintain an average rate of 100 PSI at the vessel's rail, provided shore facilities are capable of receiving same. If shore facilities do not permit discharge within the agreed time, the Master is to issue a notice of protest and endeavour to obtain the terminal's representative counter-signature. This clause only applies to a homogeneous cargo. If the vessel is subject to a single line discharge , the vessel is capable of up to 12 kg/cm pressure at the manifold provided shore facilities permit.

67) Referring to clause 9, where there is any failure to make punctual and regular payment, due to an oversight, negligence, error or omission of Charterers employees, bankers or agents, the Owner shall notify the Charterer in writing whereupon the Charterer will have 7 days to rectify the failure; when so rectified, the payment shall stand as punctual and regular payment. Evidence of the timely remittance of hire payment by the bankers designated by the Charterer shall constitute as compliance of the Charterer's obligation to pay hire, whether the Owner are so notified by the bankers or not.

68)  Should the vessel be seized or detained by any authority or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers use and   directly related extra expenses and bunkers consumed shall be for Owner's account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterer or their agents, or by reason of cargo carried.

69)  Any delay, expense and/ or fines incurred on account of smuggling to be for Charterers account if caused by the Charterer or by Charterer's servants, and to be for Owner's account is caused by the Master, officers, crew or Owner's servants.

70)  If for any reason whatsoever the vessel will not be off-hire or is reasonably estimated to be off-hire for 30 days or more except of periodical dry-docking, the Charterer has the option to cancel the balance of this Charter Party.

71)  Exxon Drug and Alcohol ( Policy ) clause

The Owner warrants that it has a policy on drug and alcohol abuse ('policy') applicable to the vessel which meets or exceeds these standards in the Oil Companies International Marine Forum Guidelines for the  control of drug and alcohol onboard ship. Under the policy, alcohol impairment shall be defined as a blood alcohol content of 40mg/ 100 ml or greater, the appropriate seafarers to be tested shall be all the vessel's officers and the drug/alcohol testing and screening shall include random or unannounced testing in addition to routine medical examinations.
An objective of the policy should be that the frequency of the random/unannounced testing to be adequate to act as an effective abuse deterrent, and that all the officers be tested at least once a year through a combined program of random/unannounced testing and routine medical examinations. The  Owner further warrants that the policy will remain in

effect during the term of this Charter Party and that Owner shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment shall not in or itself mean that the Owner has failed to exercise due diligence.

Exxon Blanket Declaration

The Owner confirms that they have issued the Exxon Drug and Alcohol Blanket Declaration Warranty.

72) Additional Oil Pollution Insurance

The Owner warrants that they have and will remain throughout the period of this Charter :-

The standard oil pollution insurance cover ( currently at US $ 1 billion ) available from Their P & I club.

73)  The Charterer is to give 12/10/8/5/3/1 days notice of redelivery port/place and date where applicable.

74)  If drums are to be loaded by the vessel's crew, then the Charterer is to pay US$15 per drum, however that Charterer is to pay for stevedores, extra dunnage and lashings for the drums.

75)  The vessel's crew is to stow all Charterer's provisions at charterer's risk and expense, however cost of same to be mutually agreed between the Master and the Charterer or Charterer's representative.

76)  Bunker clause

The vessel shall be in every way fitted for burning :

at sea  -  fuel oil with a maximum viscosity of not more than 180 Centistokes at 50 degrees Centigrade meeting category RME 25 in the International Standard ISO 8217:1996 (e) for main propulsion and marine gasoil meeting category DMA in the International Standard ISO 8217:1996 (E) for auxiliaries.

In port  -  marine gasoil meeting category DMA in the International Standard ISO 8217:1996 (E) for auxiliaries

Charterers shall supply marine fuel oil with a maximum viscosity of 180 Centistokes at 50 degrees Centigrade meeting category RME 25 in the International Standard ISO 8217:1995 (E) for main propulsion and marine gasoil meeting category DMA in the International Standard ISO 8217:1996 (E) auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers, they shall be liable for extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the specifications of marine fuel states in the International Standard ISO 8217:1996 (E). Charterers shall be responsible for loss or damage by improper or careless bunkering.

77) A commission of 1.25 % address to Charterers is payable on hire earned and paid under this Charter Party and also on any continuation or extension of this Charter Party. Commissions can be deducted from hire by Charterers.

78) European Union Clause

If during the currency of this Charter Party an applicable or relevant EU legislation, rules and/or regulations are changed or new EU legislation, rules and / or regulations become effective whether by law, degree, local rules by the insistence or requests of any EU government, local or public authority(ies) , or any person(s) purporting to act for or on their behalf , which may adversely affect or impair the performance by Owners of their obligations under this Charter, including but not limited to EU legislation , rules and/or regulations restricting the trading limits set forth in this Charter or EU legislation, rules and/ or regulations preventing the vessel to sail and/or to carry out any ship-to-ship transfer in the waters or in the Exclusive Economic Zone or European Union countries,or to enter into ports in any European Union country, then Charterers will have the option to either terminate this Charter after having served two (2) months written re-delivery notice to Owners ( during this two (2) months period the vessel shall continue to be on-hire), or to request renegotiations , by the parties hereto acting in good faith , of such relevant terms, provisions or conditions of this charter as Charterers shall indicate.

~~79) Periodical Dry Docking Clause~~

~~(a)  Vessel was last dry docked in January 2003 in shanghai, PRC. Owners have the right and obligation to drydock the vessel at regular intervals of about 30 ( thirty ) months. On each occasion Owners shall propose to Charterers a date on which they wish to dry dock the vessel, not less than 3 ( three) months before such date, and both Owners and Charterers shall, within 1 (one) month, mutually agree upon a port of such periodical dry docking. Charterers shall take all reasonable steps to make the vessel available to Owners as near tosuch date as practicable.~~

~~Owners shall put the vessel in dry dock at their expense as soon as practicable after Charterers place the vessel at Owner's disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings, and residues and shall have the right to retain any monies received therefore, without prejudice to any claim for loss of cargo under any bill of lading of this charter.~~

~~(b)  The vessel shall be off hire from the time when she is released to proceed to the dry docking port until she is again ready to tender NOR to load and place at Charterer's disposal upon sailing from the above dry dock. All fuel consumed on that passage to dry dock as well as during dry docking period shall be paid for by Owners.~~

80)  Bimco ISPS Clause

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party,

the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**For and on behalf of the Owners**                    **For and on behalf of the Charterers**

Message Printed on 4/6/20064:54:41 PM by PK RefNum:PK915471 From/To: Multi-dest


To : Multi-dest
Ref : KM-915471  05/04/06  3:21:49 PM

FM : IMS SA - 14 SKOUZE STR., PIRAEUS/GREECE
     PHONE  : 210-4588100 -  FAX 210-4183156
     EMAIL  : CHARTERING(AT)IMSSA.GR - TLX 241182

TO : ADDAX BV

DEAR ALL

M/T USSUR - ACCT ADDAX
=== C/P DTD 4.4.2006


WE CONFIRM HEREWITH CLEAN RECAP WITH ALL SUBJECTS LIFTED AND TERMS
AGREED ACCORDING TO THE FOLLWOING

M/T USUR - AS DESCRIBED BRIEFLY PLUS Q88V2
---

RIDER CLAUSE 43 TO 80 - AS PER USSUR - AFS/PRISCO 21/JUNE 2004 WITH
THE FOLLOWING CHANGES

CL 43 - OWNS WARRANT  : AA) TO HH) , AS PER PREVIOUS

CL 44 - PERIOD 12 MONTHS 30 DAYS DAYS MORE OR LESS IN CHARTS OPTION

CL 45 - DELIVERY : DROPPING OUTWARD PILOT STATION DAKAR

CL 46 - REDELIVERY : DROPPING OUTWARD PILOT STATION LAS PALMAS/LUANDA
RGE IN CHOPT WITH LAST THREE CARGOES CLEAN PETROLEUM PRODUCTS
UNLDD/UNDRK 2.50 NPA''

CL 47 - LAYCAN 05 - 15 APRIL 2006

CL 48 - DAILY HIRE - USD 5900 LESS 1.25 PCT ADDRESS COMMISSION
OVERTIME AS PER PREVIOUS EXCEPT BONUSES TO BE PAID TO OWNERS WHO SHALL
FORWARD BONUS TO THE CREW

CL 50 - ADD OWNS EXCLUSIONS AFTER USA ETC  ''CANADA/NORTH OF HAMBURG
ISRAEL/TOC/ALBANIA/IRAQ,'' ALSO INSERT ''MAIN INTENTION IS TO TRADE
WITHIN DAKAR - LAS PALMAS RANGE''

CL 51 - ADD ''PUMPING WARRANTIES WHEN DISCH BY STERN LINE ARE NOT
APPLICABLE''

CL 52 - CHARTS TO TAKE OVER AND PAY ESTIMATED BUNKERS ON BOARD ON
DELIVERY ALONG THE FIRST HIRE PAYMENT AND OWNERS ON REDELIVERY  ALONG
THE LAST HIRE PAYMENT. ABT SAME QTIES DELIVERY/ REDELIVERY WITH MINOR
DIFFERENCES TO BE ADJUSTED ACCORDINGLY. SAME PRICES ON DELIVERY AND
REDELIVERY. OWNERS MAY HAVE THE RIGHT TO BUY BUNKERS ON THEIR BEHALF
PROVIDED NOT AFFECTING CHARTS OPERATION, CHARTS TO HAVE FIRST REFUSAL
FOR SUCH SUPPLY UNLESS THEIR PRICE IS NOT COMPETITIVE

CL 53 - DELETE

CL 55 - TO READ ''TO THE BEST OF THIS OWNERS AND PREVIOUS OWNERS
KNOWLEDGE , OWNS WARRANT THAT THE...'' OWISE AS PER C/P

CL 56 - INSERT ''WEST OF ENGLAND''

CL 58 - 'LOI AS PER STANDARD WORDING OF PANDI CLUBS'

CL 64 - NOTICES FOR DELIVERY DATES/PLACE : 3/2/1 DAYS AND CHARTS/OWNS
 KEEP EACH OTHER POSTED OF VSSLS POSITION/PROSPECTS

CL 66 - DELETE LAST TWO LINES

CL 68 - LINE 4 - DELETE ''ALL'' INSERT ''DIRECTLY RELATED ''

CL 79 - DELETE AS NOT APPLICABLE+


Shelltime 4 c/p with following amendments:

------------------------------------------------------------------

cl 1. Line 2 insert  'eastwood enterprises sa, monrovia liberia'

        Line 5 insert ''Africa Sea Shipping N.V., Curacao''
        Line 6 insert to read ''and throughout the entire duration of
            the charter''

        line 7 : russing maritime register of shipping
        line 8 delete
crude

  insert ''cargoes to always compatible
              with vssls  tanks,lines,pumps and heating coils'
        line 14 insert '180'centistokes delete 'any'
        line 15 delete ''commercial ACGFO)'' delete ''diesel oil and
            insert ''marine gasoil'' - delete ''ACGFO''
        line 17 delete ''ACGFO'' insert ''marine gasoil''

        line 21 delete
any

  insert
international
        line 22 / 23 delete ''form b'' insert ''q88V2 and ABS appendix''

cl 2. add at the end
always weather permitting'

cl 3. Line 64 delete 'without limitation'.

cl 4. Line 66 delete all lawful merchandise and insert
as per main
        terms
        Line 67 delete        .
including in particular
. Refer to clause 49
        'clean unleaded and/or dirty petroleum products always to be
        compatible with the vessel's pumps, lines, valves and vessel's
        cargo resistance list'

        Line 68 delete ''in any part of the world'' and insert
within
        trading areas as agreed
 .

        line 69-72 delete
notwithstanding the foregoing

  such order
 .

        line 79 insert ''subject to masters final approval not to be
        unreasonably withheld''

        line 81 add at the end
and ISGOTT requirements
        line 82+83 insert as per main terms

cl 5 line 85 - insert ''5th April''

        line 86 - insert ''see clause 47''

cl 6 line 89 - insert ''domestic garbage''

cl 7 line 97 - insert ''whilst on hire'' delete
except..services


cl 8 line 105 - insert ''see clause 48''

cl 9 line 108 - insert ''owners designated bank account''

        line 109 - delete ''account..in per calendar month'' insert
        ''every 30 days''

        line 124-125 delete
''9  points

Page 3                          RefNum:915471

cl 10 line 132 - insert ''200''

cl 11 delete whole clause insert ''see clause 48''

cl 13 (a) line 142 before 'orders' add 'lawful'
     (b) insert
as per owners P+I club wording with no bank
           guarantee

cl 15 delete whole clause and insert ''see clause 52''

cl 16  Line 171
 delete
whatsoever'

cl 17  line 180 - insert ''supernumeraries

       line 182 - insert ''usd 20''
       end of clause add ''charts supercargoes joining the vessel
       to sign relevant letter of indemnity

cl 19 line 191 - start reading ''estimated'' delete''pursuant to cl
      15'' insert ''which may exceed the minimum requirments se forth
      in clause 15''

cl 21 line 225 - insert ''and/or due to any seizure under legal
      process then..''

      add at the end
no claims for consequencial damages shall
      apply under this charter party

cl 22 delete and replace with "owners warrant no dry docking during
      the charter period. In the event of emergency dry docking,
      payment of hire shall cease from the time of deviation until
      the vessel is again in the same position. All pilotage, fuel
      and other expenses related to and while proceeding to and
      from and while drydocking shall be for owners account."

cl 23 line 292 after inspection add
at charterers risk and expense

cl 24 insert ''see also vessels description''

    Add at end of clause
no over performance cls to apply
.

cl 26 line 360 after
freights

 insert
sub-hires


cl 29 delete ''ACGFO'' two times - insert ''180'' - ''mgo'' resp

      delete lines 395/396 and insert ''see clause 76''

cl 32 Delete last sentence ('any such requisition...period')

cl 33 Delete
Netherlands


cl 34 Delete from 'and provided further' until end of the clause

cl 37 line 462 insert ''as amended 1994''
      line 463-474  delete ''but should .......... before delivery

                              Message Continues...

--------------------------------------------------------------

        line 476 before laws insert
English

        line 477 delete
of the United States of America

cl 38 delete whole clause and insert ''see clause 63''

cl 41 Add at the end
disputes upto 50.000.- shall be settled
        according to small claims procedure as per LMAA Rules


+


We wish to Thank very much a l l, for the great efforts rendered
resulted this further fixture together


kind Regards/IMS SA
Costas Moutzouridis


        ----------------- End of Message ----------------

Ex. B

**FIRST ORIGINAL**

CURACAO, 27TH MARCH 2007

## MT USSUR – TCP DATED 4TH APRIL 2006

## ADDENDUM NO. 1

PURSUANT TO THE PROVISIONS OF THE CAPTIONED CHARTER PARTY DATED 4TH APRIL 2006 BETWEEN EASTWOOD ENTERPRISES S.A., LIBERIA AS OWNERS AND AFRICA SEA SHIPPING N.V., CURACAO AS CHARTERERS:

IT HAS BEEN TODAY MUTUALLY AGREED THE FOLLOWING:

1. TO EXTEND THE CAPTIONED CHARTER PARTY UNDER THE SAME TERMS AND CONDITIONS AT A REVISED HIRE RATE OF USD 6'100- PER DAY PRO RATA FOR ONE ADDITIONAL YEAR FROM THE 7TH APRIL 2007 UNTIL THE 7TH APRIL 2008 +/- 30 DAYS IN CHARTERERS' OPTION.

THROUGHOUT THE ENTIRE CHARTER PERIOD OWNERS WARRANT THAT:

2. THE VESSEL WILL REMAIN CLASSED BY A CLASSIFICATION SOCIETY WHICH IS A MEMBER OF THE INTERNATIONAL ASSOCIATION OF CLASSIFICATION SOCIETIES.
3. THE VESSEL WILL REMAIN PROPERLY ENTERED IN A P&I CLUB WHICH IS A MEMBER OF THE INTERNATIONAL GROUP OF P&I CLUBS.
4. THE VESSEL WILL REMAIN LIBERIAN FLAGGED.
5. THE VESSEL WILL REMAIN COMPLIANT WITH THE PROVISIONS OF THE CONDITIONS ASSESSMENT SCHEME (CAS) AND HOLD A VALID CAS STATEMENT OF COMPLIANCE.
6. FOLLOWING DOCUMENTS, AS ATTACHED, SHALL BE INCORPORATED IN THE CHARTER:
- THE LETTER OF AUTHORISATION TO CARRY HEAVY GRADE OIL FOR MT USSUR ISSUED BY VESSEL FLAG STATE LIBERIA AND DATED 10TH APRIL 2006.
- HARMONISED VESSEL PARTICULARS QUESTIONNAIRE (HVPQ)
- INTERTANKO QUESTIONNAIRE 88
- CAS STATEMENT OF COMPLIANCE
- CLASSIFICATION CERTIFICATE
- P&I CERTIFICATE OF ENTRY

7. VESSEL SPEED IS WARRANTED UPTO AND INCLUDING BEAUFORT SCALE 4 AND DOUGLAS STATE 3.

**EASTWOOD ENTERPRISES S.A.**          **AFRICA SEA SHIPPING N.V.**

# Ex. C

*EASTWOOD ENTERPRISES S.A.*
*LIBERIA*

To: AFRICA SEA SHIPPING N.V., CURACAO

Piraeus, 18th June 2008

## MT USSUR – ACNT AFRICA SEA SHIPPING CPDD 04.04.06 AND ADDENDUM PFHS INVOICE

-HIRE:
As from 10.04.06 at 20:30hrs LT
To          08.02.08 at 12:00hrs LT
Days 668.64583
• Period at USD 5,900PD
Fm 10.04.06 at 20:30hrs
To  06.04.07 at 23:59hrs
Days 361.14583 x USD 5,900PD                              2,130,760.42
• Period at USD 6,100PD
Fm 07.04.07 at 00:01hrs
To  08.02.08 at 12:00hrs
Days 307.5 x USD 6,100PD                                  1,875,750.00

-Less 1.25% address commission                50,081.38

-Overtime ($1,500 per month)                                 33,000.00

-Master's bonus ($500 per month)                             11,000.00

-Less various off hires & owners' expenses:
• Dev. 01.06.06 & 16.06.06                       5,918.09
• Off hire 16-17.10.06                           5,651.46
• O/E June – Aug. '06                            1,199.75
• O/E D/N 26319                                    307.67
• O/E D/N 27196                                    156.61
• Off hire 22-23.05.07                           2,934.21
• O/E 27308                                      1,303.84
• O/E 27704                                        269.37
• O/E 27847                                        277.00
• Off hire 06-07.09.07                           6,023.75
• Off hire 07-14.10.07                          65,791.33

-BOD:

| | | |
|---|---|---|
| IFO: 89mts x USD 378PMT | | 33,642.00 |
| MGO: 54mts x USD 666PMT | | 35,964.00 |

-Off hire:
As from 03.12.07 at 02:30hrs
To      20.01.08 at 17:00hrs

| | | |
|---|---|---|
| Days 48.60416 x USD 6,100PD | 296,485.42 | |

-Plus 1.25% address com. on off hire:                3,706.07

-Plus STS ops with MT Mars:
As from 20.12.07 at 07:30hrs
To      22.12.07 at 05:45hrs
Days 1.79166 x USD 6,100PD                10,929.17

-Less 1.25% address com. for sts with Mars    136.61

-Bunkers off hire:

| | | |
|---|---|---|
| IFO: 81.1mts x USD 378PMT | 30,655.80 | |
| MGO: 60.1mts x USD 666PMT | 40,026.60 | |

-Plus bunkers during sts with Mars

| | | |
|---|---|---|
| IFO: 3.04mts x USD 378PMT | | 1,149.12 |
| MGO: 3.76mts x USD 666PMT | | 2,504.16 |

-BOR:

| | | |
|---|---|---|
| IFO: 245mts x USD 378PMT | 92,610.00 | |
| MGO: 46mts x USD 666PMT | 30,636.00 | |

-Damages on acnt of lost sale:           620,000.00

-Indemnity for first buyers' claim against
Owners:                          min 416,500.00

-Damages due to arrest of vessel:        prov. 24,400.00

-Less remittances received:    3,745,409.12

| | | |
|---|---|---|
| | 4,375,874.01 | 5,199,304.94 |
| Balance due to Owners USD | 823,430.93 | |
| | 5,199,304.94 | 5,199,304.94 |